Anthony T. **LEE et al., Plaintiffs,**

**United States of America,**
**Plaintiff-Intervenor,**

**National Education Association,**
**Plaintiff-Intervenor,**

v.

**DALLAS COUNTY BOARD OF EDUCATION et al., Defendants.**

**Civ. A. No. 5945–70–H.**

United States District Court,
S. D. Alabama, N. D.

Feb. 23, 1978.

---

See also, D.C., 456 F.Supp. 1175.

Solomon S. Seay, Jr., Montgomery, Ala., Jack Greenberg, NAACP Legal Defense Fund, New York City, for plaintiffs.

William A. Kimbrough, U. S. Atty., Mobile, Ala., Michael B. Wise, Ed. Section, Civ. Rights Div., Dept. of Justice, Washington, D. C., for the U. S.

Joe T. Pilcher, Jr., Selma, Ala., for Dallas County Bd. of Ed.

HAND, District Judge.

This matter came on for trial before the Court on January 26–27 and February 1–2, 1978, on the government's motion for enforcement of prior injunctive orders of both this Court and the three-judge panel which previously handled this case. The Court has considered the pleadings, documents and other exhibits introduced at trial, the testimony adduced at trial, and the pre-existing record on file in this matter, along with the applicable law, and finds as follows:

### FINDINGS OF FACT

#### I. *Historical Perspective*

1. On February 13, 1970, the three-judge panel approved the original desegregation plan adopted by the Dallas County Board of Education (hereinafter Board) and ordered that such plan be implemented in time for the 1970–71 school year. (Order of February 13, 1970, p. 2 [Hereinafter 1970 Order]). The approval and implementation of the desegregation plan was intended to provide "for the effective and complete disestablishment of [Dallas County's] dual school system based upon race. (1970 Order, p. 1). This plan has governed the operation and administration of the Dallas County School System for the past eight years.

2. On July 27, 1971, the plaintiffs, the government, and the defendants entered into a consent order by which the Board agreed to "comply with the Court-ordered desegregation plan . . . including the assignment of each student in the school system to the school facility designated in the desegregation plan to serve his or her attendance area and grade level on a nonsegregated, non-discriminatory basis. (Consent Order, July 27, 1971).[1]

3. On October 22, 1975, a consent decree issued by which the defendant Board was ordered to comply with the rules set down in *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211 (5th Cir. 1970), with respect to hiring, firing, promotion, or demotion of teachers within the system.[2]

4. On July 26, 1977, the government filed a motion for enforcement and modification of injunction, the question presently before the Court, alleging first that the defendant Board has failed to comply with the pre-existing injunctive orders in this case and secondly that the original desegregation plan should be modified, since such plan has failed to fully desegregate the Dallas County School System. By Order of November 10, 1977, the Court denied so much of the motion as requested modifica-

---

1. In 1971 the Department of Justice and the School Board reviewed contentions by the Department that desegregation plan did not do what it was designed to do and resolved this in favor of the plan. The government was represented by Theodore Ravas and the School Board by Joe Pilcher.

2. Also considered in the hearing in connection with this decree was the closing of E. M. Brown elementary school.

tion of the original plan, finding that the validity of the plan had been reaffirmed by the Court's prior rulings and the order of February 10, 1977, which orders have not been appealed. Therefore, the Court is concerned in this phase of the case only with the government's allegations that the Board has not complied with the original desegregation plan.

5. There are presently fifteen schools maintained by the defendant Board—three high schools,[3] four junior high schools,[4] seven elementary schools,[5] and one area vocational school.

There are three high school attendance zones. The students residing in the general northeast portion of the county attend Dallas County High School in Planstersville. Those residing in the western sector attend Keith High School in Orrville. Those residing in the southern area attend Southside High School, located just south of Selma. The zone lines are pretty well delineated by the Alabama and Cahaba Rivers.

The junior high facilities are Hazen-Harrell, Shiloh, Tipton, and Brantley, each serving a separate attendance zone. Hazen-Harrell is in the northwest portion of the county, Brantley is in the eastern portion of the county, and both Tipton and Shiloh are in the southern portion of the county.

Both J. E. Terry and Valley Grande elementary schools are in the northeast portion of the county. Salem and Martin Station elementary schools serve the western and northwestern portions of the county. Five Points, Hunter Mission, and Southside elementary schools serve the southern portion of the county.

3. The high school classification encompasses those schools serving grades 7 to 12.

4. The junior high school classification encompasses those schools serving grades 1 to 9.

5. The elementary school classification encompasses those schools serving K or 1 to 6.

6. The government contends that the closing of these schools requires a reconsideration and modification of the desegregation plan entered in 1970. The Court is convinced that a less drastic remedy is available. The freedom of choice remedy made available to these students at the affected schools is not reasonable, but a

Since the 1970 desegregation order three schools have been closed: Tyler Union school in the eastern portion of the county, Westlawn school in the western area and E. M. Brown in the southern area. The evidence before the Court does not reveal that the closing of such schools has impaired the effectiveness of the 1970 plan.[6] There have been no other changes in the system since the 1970 order.

## II. *Zone-Jumping*

6. The Board established attendance zones in compliance with the 1970 order of the three-judge panel:

The Dallas County Board of Education is ORDERED to establish fixed zone lines for the attendance areas which it designates in its plan as the western, northeastern, and southern zones, and the elementary and junior high school zones within these three attendance areas.

(1970 Order, p. 3). There is no allegation that this order has not been fully complied with, but rather that the Board has failed in its duty to strictly enforce the attendance zone areas.

7. The evidence convincingly establishes that the zone lines have not been strictly enforced by the defendant Board. Testimony before the Court revealed that several children presently residing in the Brantley elementary school zone attend J. E. Terry elementary school,[7] and that several children presently residing within the Tipton elementary school zone attend Southside elementary.[8] After testimony of such viola-

redrawing of the zone lines in the Westlawn, E. M. Brown and Tyler Union areas should be effective.

7. Three parents residing outside the J. E. Terry elementary school attendance zone testified that their children attended Terry, and one named four other families in her immediate area who had children at Terry.

8. The evidence is clear that residents of Capps Trailer Park and Maplewood Trailer Park, in the Tipton elementary attendance zone, sent their children to Southwide elementary school.

tions had been elicited, the defendant acknowledged that attendance zone lines had been violated and the government, upon the recommendation of the Court, released several other witnesses who purportedly would have testified concerning other instances of violations.[9] The testimony did not directly establish that the defendant Board participated in, encouraged, or acquiesced in such violations in each instance, but it is clear that the Board and its agents knew or should have known that zone lines were being crossed by many students.[10]

8. The technique employed by the Board in the past to prevent such abuses is described by the Superintendent as the "Address Verification Procedure." There is no written procedure for this, but rather it stems from word-of-mouth instructions emanating from the Superintendent's office. The procedure requires that the student or his or her parents fill out an address verification card during registration at the commencement of the school year. The principal or other administrative official at the school then checks to make sure that the address on the card is properly within the attendance zone for the school in which the student is attempting to enroll. If the address is properly within the zone, no further inquiry is made; if the address is outside the zone, the child is not allowed to register. No investigation is made to verify that the address given is the address at which the child actually resides.

9. There is a further contention that the Board encourages zone-jumping through its transportation facilities. Testimony revealed that a great many students who attended out-of-zone schools facilitated their efforts by riding Dallas County school buses. No instances were revealed in which out-of-zone students were picked up in one attendance zone and transported to a school in another zone, but it is clear that many students were transported privately to a point within another attendance zone where they were picked up by the Board's buses and were transported to schools within that zone.[11] The bus drivers' instructions are to pick up all children who are waiting to be transported, and to report to the principal any unauthorized riders. The drivers are not furnished with a list of those students authorized to be transported, and the Board appears to place the burden on the drivers to determine who is or is not a proper passenger.

To prevent the transportation of out-of-zone students, each driver is instructed where he or she may pick up students, and the drivers are instructed not to pick up students beyond certain designated points. Such a policy is clearly ineffectual in dealing with the above-described zone-jumping technique in which private transportation is employed to cross the zone lines.

9. The Board declined to stipulate as to the testimony of these other witnesses, who were adverse to all parties and the Board was disinclined to put words in their mouth and then publish it as a suit had already been threatened as a result of this case, but the Court is convinced that such testimony would be cumulative and that the government clearly supplied enough testimony to support a finding of violations.

10. The only evidence presented which affirmatively implicated the Board in the zone-jumping violations was the testimony of Betty Law that Charles Leavins, the principal of J. E. Terry elementary school, told her that she should get a Plantersville post office box if she wanted to keep her two children in school there. Mrs. Law resides in the Burnsville area and her children should properly be enrolled at Brantley. This was the only instance revealed by the evidence of school board participation in a vio-

lation, and the Court notes that it was conduct by an agent outside the scope of his authority.

11. Testimony revealed at least three "drop" points: (1) At the intersection of highways 80 and 14 west of Selma, students were observed waiting for Bus 37 to carry them to schools in the northeast corner of Dallas County. No evidence was presented at trial that any of the students awaiting the bus at that point were jumping zones. (2) Many cars were observed transporting students to a gas pumping station on Pea Ridge Road, County Road 84. Testimony revealed that many, if not all, of the students boarding the bus at that point were zone-jumping. (3) Many students were picked up by school buses at a point within the Southside elementary attendance zone on the Old Montgomery Highway. Testimony revealed that some, if not all, of these students, resided in the Tipton attendance zone.

10. On January 30, 1978, during the pendency of the trial of this matter but after the government had put on most of its evidence with respect to zone-jumping, the Board filed various newly adopted administrative procedures bearing upon the zone-jumping problem. With the elimination of such violations in mind, the Board adopted the following guidelines:

(A) A program shall be instituted to familiarize the faculty and Board staff with the provisions and requirements of the desegregation plan.

(B) A new position designated Director of Attendance shall be opened to, *inter alia,* verify that all students are attending schools within their zones;

(C) New enrollment forms shall be implemented, requiring greater detail with respect to student addresses;

(D) Principals will be allowed to request investigations into those addresses which they cannot themselves resolve;

(E) Children changing residences during the school year will be allowed to complete the year in the school in which they properly enrolled, but such changes are to be reported to the Director of Attendance;

(F) Records of requests for transcripts are to be submitted to the Board;

(G) The Director of Attendance shall maintain records with respect to those persons who do not return in September to the same school they attended the previous year;

(H) Stricter rules regarding transportation of students by Board buses are implemented; and

(I) Attendance of school outside the zone of residence is to be permitted only where allowed by the terms of the desegregation plan.

The provisions of the foregoing plan took immediate effect upon passage by the Board. (Report of Administrative Procedures adopted by Dallas County Board of Education on January 30, 1978).

11. From the testimony adduced at trial, the Court is convinced that the Board and/or its agents knew or should have known that violation of the 1970 order in the nature of zone-jumping existed within the Dallas County School System. However, the Court finds the Board's involvement in such violations to be in the nature of negligence, in the sense that the Board failed to take affirmative steps to preclude such violations, rather than intentional, in the sense that the Board openly advocated, encouraged, or aided such zone-jumping.[12]

### III. *Faculty and Staff Assignment*

12. In the 1970 order, the three-judge panel ordered the defendant to bring the system into compliance with *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211 (5th Cir. 1970), insofar as the assignment of faculty and staff are concerned:

The Dallas County Board of Education shall assign the teaching staff as above described so that the ratio of negro to white teachers in each school, and the negro to white ratio of other staff members in each school, are substantially the same as each such ratio is for the teachers and other staff members in the entire system.

(1970 Order, p. 3).

13. In the consent decree entered October 22, 1975, the Court ordered that the defendant Board take various steps to bring the system into compliance with the 1970 Order:

(a) Adopt non-racial objective criteria upon which demotion or dismissal of teachers or other staff personnel might be based;

(b) Offer employment to certain individuals allegedly demoted or dismissed solely by reason of their color or race;

(c) Institute a hiring preference in favor of those teachers and staff members indicating a willingness to serve at schools in which their race is in the minority;

(d) Implement a faculty assignment plan by which the 1970 Order might be finally complied with;

**12.** See note 10, *supra.*

(e) File annual reports with the Court reflecting faculty and staff assignments, so that the Court might appraise the results of the Board's efforts at compliance. (Consent decree of October 22, 1975). This being a consent decree, there was no specific finding with respect to whether the defendant Board had complied with the *Singleton* requirements as set out in the 1970 Order.

14. On November 3, 1975, the defendant Board filed its annual report reflecting the racial composition of the faculties at all Dallas County Schools during the 1974–75 and the 1975–76 school year.

15. For the 1974–75 school year, the figures reflect that the black/white ratio among faculty members was 65.9%/34.1%. The school most closely reflecting this ratio was Hunter Mission elementary school, where there was a 76.2%/23.8% ratio, a variance of over 15% from the system wide ratio. At all other schools the variance was even greater. There were four schools that had a 100% black faculty, and seven other schools that had a predominately white faculty.[13]

16. For the 1975–76 school year, the figures reflect that the black/white ratio among faculty members was 60.1%/39.9%. Tyler elementary school reflected this percentage almost exactly (61.5%/38.5%), but there was a substantial variance from this ratio in most of the system's schools. Three schools retained a 100% black faculty, and six others had predominately white faculties.[14]

17. On November 4, 1976, the Board filed its annual report for the 1976–77 school year. The figures in this report reflect a black/white ratio among faculty members of 57.7%/42.3%. The Board was reasonably close to achieving this ratio at Brantley, Tipton, and Westlawn schools, but there was still a substantial variance from the ratio throughout the system. Two schools retained a 100% black faculty, and six other schools maintained predominately white faculties.[15]

18. The Board's most recent report, filed on January 26, 1978, reflects the faculty composition for the 1977–78 school year. The figures reflect a black/white ratio among faculty members of 59.4%/40.6%. This ratio is most closely reflected by the 55.2%/44.8% ratio at Valley Grande elementary school, but the disparity in the ratios throughout the system has subsided little. There are still two schools with completely black faculties and five others where the faculties are predominately white.[16]

### IV. *Majority to Minority Transfers*

19. The desegregation plan filed by the Board on January 15, 1970 and adopted by the three-judge panel in the 1970 Order provided that: "Should there ever exist a situation where schools contain a majority of negro students, the Dallas County School System shall permit a student (negro or white) attending a school in which his race is in the majority to choose to attend another school where space is available, and where his race is in the minority. (Desegregation plan of January 15, 1970, Paragraph VI, p. 5). The Board has reasserted its dedication to the majority to minority transfer program through its administrative procedures adopted on January 30, 1978.

20. The report of the defendant Board filed January 26, 1978 reveals that there have been no requests made for transfer under the majority to minority transfer program in the past school year. The report does not reflect how many, if any, requests have been made since the inception of the desegregation plan, and the Court is without further information bearing on this issue.

---

13. Among these predominately white faculties was the Dallas Area Vocational Center. Since a vocational school's faculty is not interchangeable with that of the other schools within the system, the Court is of the opinion that the vocational center is due to be dealt with separately and individually on all questions relating to faculty assignment.

14. See Note 13, *supra.*

15. See Note 13, *supra.*

16. See Note 13, *supra.*

21. Testimony revealed that little, if any, advertisement or publication has been made with respect to this transfer program; indeed, at least one principal within the system had no familiarity with the plan, alleging that the provisions had never been explained to him by the defendant Board.

### V. *Equal Facilities*

22. The government contends that the defendant Board is discriminating against certain students because the facilities maintained by the Board are not equal. The allegation is that "unless defendants are required to equalize the program, facilities, equipment, and supplies available at each of the schools they maintain, defendants will continue to operate those schools which are attended only by black students as less adequate facilities than those schools which substantial numbers of white students attend." (Motion for Enforcement and Modification of Injunction, July 26, 1977, Paragraph 28, at p. 11).

23. Testimony of the government's expert witness [17] indicates that, at the elementary level, Southside, J. E. Terry and Valley Grande elementary schools are superior facilities to Five Points, Hunter Mission, Salem, and Martin Station elementary schools. The three allegedly superior facilities are predominately white schools, while the other four have completely black enrollments. (Board Report, January 26, 1978, Exhibit A). The base for the expert's opinion included the facts that the former schools were more recently constructed; that all three schools have private library facilities; that there are no portable units at these three schools, while there are at the other four; and the general quality of instruc-

tional space is better in the first three schools than in the last four.[18]

With respect to the junior high schools, all of which have completely black enrollments, (Board Report, January 26, 1978, Exhibit A) the government's expert opines that Hazen-Harrell and Brantley are slightly superior to Tipton and Shiloh, but that all are substandard when compared to the junior high facilities at Keith, Dallas County, and Southside high schools.

At the high school level, the expert's opinion is that Keith high school, with a completely black enrollment, is inferior to Southside high school and Dallas County high school, which are, respectively, predominately black and predominately white. (Board Report, January 26, 1978, Exhibit A). The opinion is based on such conclusions as that there are better science facilities, lighting, athletic fields, and library facilities at Southside and Dallas County than at Keith.

24. Since 1970 there has been no new construction at any of the junior high schools. At the high school level, additions have been constructed to both Dallas County high school and Keith high school since the implementation of the desegregation plan. During the same period, much new construction was performed at J. E. Terry, Valley Grande, and Southside elementary schools, while the new construction at the completely black schools amounted only to the providing of portable buildings at each facility. Testimony by the Superintendent revealed that the Board's intent in so allocating its new construction was to provide greater permanent facilities at those schools in which enrollments were increasing, and

17. Dr. Herbert Sheaphelm testified as an expert for the government. Sheaphelm is presently a professor at the University of Connecticut in the area of Education Administration. He has a Ph.D. in Educational Administration from Michigan State University, was a member of that University's Field Services team for one year, and served three years as Director of Educational Facilities Planning for the Lansing, Michigan school district. He visited all of the Dallas County schools during a one week period shortly before the trial, but was unable to

spend more than two hours at any individual facility. Although Sheaphelm has never previously testified on behalf of the government in a case of this nature, the Court determined that he was qualified to appear as an expert witness on the matters before the Court.

18. Dr. Sheaphelm bases his rating of general quality of instructional space upon consideration of visual, thermal, acoustic, and aesthetic qualities, with other factors averaged in when they appear.

providing temporary relief through portable classrooms at those facilities where the future need did not appear so great.[19] Obviously, the apparent necessity confronting the Board was strengthened somewhat by the zone-jumping students attending J. E. Terry, Valley Grande, and Southside, but there is no evidence that these facilities were improved by the Board pursuant to a policy, practice, or desire to discriminate against students at the other schools. They were merely added to keep up with expanding enrollment.

25. The Board budget also reflects a janitorial supply allotment for each school. The Board employs a matching formula by which the Board gives the school $3.00 for every dollar that the school provides either itself or through outside sources. The 1977–78 allotment (Defendant's Exhibit 120) does not reveal that the method serves to discriminate against those students in all black or predominately black schools.

26. Fee replacement money provided to each school is based upon a statutory formula by which the number of teacher units are multiplied by $300.00, and the resulting amount is allocated to that school. No evidence was presented that such an allocation or the formula by which it is obtained discriminates against black students.

27. The library, guidance, and testing allocations for the 1977–78 school year (Defendant's Exhibit 123) are regulated by federal law, and there was no showing that the operation or administration of such allocations served to discriminate against black students.

28. In the 1977–78 general maintenance allocation, the Board utilized a formula of multiplying the number of teacher units at each school by $40.00 to arrive at the amount to be allocated to each school (Defendant's Exhibit 124). The allocation to each school is based on its size, enrollment, and faculty, and no showing has been made that such allocations serve to discriminate against black students.

29. The government makes a final contention that the Board's policy of allowing individual schools to accept the benefits provided by local Parent-Teacher Organizations to the exclusion of other schools within the system discriminates against those schools in less affluent areas or those that have less affluent organizations. The most graphic evidence of this policy is at Valley Grande elementary, where the local P.T.O. installed an air conditioning system, and at Southside high school, where a new field house was constructed through support of the local community. Testimony of the Superintendent revealed that this option is open to any P.T.O. or other community organization. The contributions do not go to the Board, but rather to the physical property of the Board, and are finally reflected on inventories of school property. Further testimony revealed that the P.T.O. is generally responsible for the acquisition and maintenance of playground equipment, unless the school is able to fund this itself through local projects. The Court takes judicial notice, from experience with other school districts, that Alabama public schools have traditionally depended upon community support for many of the necessities not provided by school boards.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this action and the parties hereto by virtue of Title IV of the Civil Rights Act of 1964, Title 42, U.S.C.A. §§ 2000c et seq.

2. That part of the government's July 26, 1977 motion that sought modification of the desegregation plan entered January 15, 1970 was properly dismissed by the Court's order of November 10, 1977. The Court ruled on February 10, 1977 that the Dallas County School System was desegregated and unitary, and no appeal was taken from this order. If the government seriously contests the validity of the plan, the

---

**19.** Testimony showed a continuation of loss of students at those schools where portables are located and in the immediate future these will be eliminated. Should shifts in population change it may require reassessment.

proper vehicle for challenge would have been an appeal from the February 10, 1977 order. Of course, the failure to appeal from the February order is not a bar if there are changed facts, conditions, or circumstances, *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (5th Cir. 1976), but the only allegation by the government that such changes have occurred is with respect to the closing of schools. The Court is of the opinion that alteration of the entire desegregation plan due to school closings would be unreasonable, and especially in view of the fact that any impairment of the plan caused by the closings may be dealt with through a simple redistricting. Since the Court is convinced that the closing of the schools did not serve to impair the effectiveness of the desegregation plan, the Court is of the opinion that such closings do not form an adequate basis for the extensive relief sought by the government.[20]

3. The Court is particularly concerned with the evidence reflecting that zone-jumping has occurred in the past and is presently occurring within the Dallas County School System. Clearly, strict adherence to the existing geographical attendance zones is necessary for the desegregation plan to succeed. The Court is of the opinion that the Dallas County desegregation plan has not really been fully effective, at least with respect to student assignment, because of the failure of the Board to strictly enforce the geographical attendance areas. There is some indication of demographic changes; however, a study of the results of enforcement is required before it can be claimed that prior conclusions were defective.

■ 4. The Court does not agree with the government's contention that the Board's conduct and that of its agents with respect to zone-jumping constitute intentional racial discrimination. The constitutional test is set out in *Keyes v. School District No. 1*, 413 U.S. 189, 208, 93 S.Ct.

2686, 2697, 37 L.Ed.2d 548 (1973): "The differentiating factor between de jure segregation and so-called de facto segregation . . . is purpose or intent to segregate." The government contends that such an intent or purpose is established by evidence that one principal advised at least one parent on how the effect of the desegregation plan might be avoided, and by evidence that the methods employed by the Board in attempting to enforce zone lines were, for the most part, ineffective. While the Court is convinced that the Board was at least negligent in not strictly enforcing the zone lines, the evidence does not support the contention that the Board has actively engaged in violations of the 1970 order with respect to student assignment. The Court is convinced that the conduct of the Board on this point cannot be characterized as obdurately obstinate, as has been the case with other Boards within this Court's jurisdiction. *E. g., United States v. Wilcox County Board of Education*, 494 F.2d 575 (5th Cir. 1974).

■ 5. As a preliminary matter, it is a constitutional requirement that all public school boards must act to disestablish prior dual systems. *Brown v. Board of Education of Topeka*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). And the burden of effectuating such disestablishment rests upon the school boards, who are under an affirmative duty to take whatever steps might be necessary to fully desegregate systems. *McDaniel v. Barresi*, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971). Should the Board be unwilling to accept its task, or should it fail to do so, this Court has broad equitable powers to assure the existence of a unitary system. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

■ The Court concludes that the Dallas County School Board has breached its affirmative duty to enforce the 1970 desegregation plan by not strictly enforcing the geographical attendance zones, and that an

20. Again, the closing question was considered in 1975 and no contest was presented to the Court's ruling.

immediate remedy is required to perpetuate the unitary status already achieved within the system. Therefore, the Court is of the opinion that the defendant Board is due to be enjoined from participating in, advocating, or acquiescing in violations of the geographical attendance zone, and further enjoined from failing or refusing to fully investigate and certify the correct residential address of each student within the system. In addition, the Board is due to be enjoined from allowing its transportation facilities to be utilized by persons violating the geographical attendance zones.

■ 6. The government next challenges the faculty and staff assignments employed by the defendant Board. The law is well-settled in this area:

. . . the district shall assign the staff . . . so that the ratio of Negro to white teachers in each school, and the ratio of other staff in each, are substantially the same as each such ratio is the teachers and other staff, respectively, in the entire school system.

The school district shall, to the extent necessary to carry out this desegregation plan, direct members of its staff as a condition of continued employment to accept new assignments.

*Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211, 1218 (5th Cir. 1970). Although this was an essential component of the 1970 plan, the Board has completely failed to effectuate the *Singleton* policies. The Court is of the opinion that such violations of the desegregation plan cannot continue, and that the Board is due to be enjoined from failing or refusing to comply with the *Singleton* requirements at the start of the 1978–79 school year.

■ 7. The third issue raised by the government relates to the majority to minority transfer program provided for in the 1970 desegregation plan. This type of program has been recognized as a fundamental component in any unitary system. *Singleton, supra* at 1218. The evidence clearly establishes that the Board has been remiss in its duty to adequately familiarize its staff and the general public with regard to

the provisions of this program, and the Court is of the opinion that the Board is due to be enjoined from failing or refusing to advertise and publicize this program to the end that all staff and the general public are familiar with its provisions, and from failing or refusing to make the benefits of such program available to each and every student within the system.

■ 8. The final contention of the government is that the defendant Board is perpetuating the effects of the former dual system by favoring facilities with predominately white enrollments to the extent that there is a lack of equality in the facilities within the system. The Court is convinced that while the government has established a lack of perfect equality of facilities, there has been no showing that the decisions made by the Board with respect to funding, new construction, school closing, and acceptance of community contributions were based on anything other than sound educational criteria.

■ 9. The first question on the disparity issue is whether the Board, through its admittedly more generous funding with respect to construction at the predominately white elementary schools, has discriminated against black students attending the other elementary schools. The Court starts with the proposition that any new construction of facilities must not be racially motivated. *Lee v. Autauga County*, 514 F.2d 646 (5th Cir. 1975); *Brown v. Board of Education of the City of Bessemer*, 446 F.2d 75 (5th Cir. 1971), *cert. denied*, 409 U.S. 981, 93 S.Ct. 317, 34 L.Ed.2d 245 (1972); *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (1970). The evidence before the Court revealed that the motivation for improving the facilities at J. E. Terry, Valley Grande, and Southside elementary schools was demographic— the Board's view was that these schools were in the areas receiving the heaviest population influx and were therefore more in need of preparation for future adequacy. This is clearly an internal administrative conclusion of the Board, and the Court

should be wary to intrude in the absence of evidence of racially discriminatory motivation. *Augustus v. School Board of Escambia County,* 507 F.2d 152 (5th Cir. 1975); *Shanley v. Northeast Independent School District of Bexar County,* 462 F.2d 960 (5th Cir. 1972). While there was a clear showing that the facilities within the Dallas County system are not purely equal, there was no evidence that such inequality was the result of Board activities. In reaching this conclusion, the Court is somewhat persuaded by the fact that the three-judge panel in 1970 accepted the plan and the facilities it incorporated, and that construction and maintenance of these facilities since that time do not appear to be contrary to the purpose, intent, and spirit of the 1970 order. Also, there is a distinct possibility that when the Board fully complies with the student assignment orders of the Court, *supra,* the schools now predominately white will not continue to be so constituted. This certainly rebuts the government's contention that the mere fact that such schools were predominately white raises a presumption of discriminatory motivation.

■ 10. The second question raised with respect to the disparity issue concerns Parent-Teacher Organizations and other community groups that contribute property, time, money, and labor to the local schools. The Court is convinced that this issue is so insubstantial and lacking in racial discrimination as to not merit remedy by the Court. *Boykins v. Fairfield Board of Education,* 492 F.2d 697 (5th Cir. 1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1350, 43 L.Ed.2d 438 (1975). The Supreme Court has upheld a state education funding scheme by which each district supplements its state aid through local property taxes, *San Antonio Independent School District v. Rodriquez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), and this Court is of the opinion that local contributions are quite analogous. Obviously, the more affluent areas will be able to make greater contributions to the local schools, resulting in some inequality within the system, but the Court is compelled to balance this inequality with the consideration that requiring all contribu-

tions to go into a general fund for a later equal distribution might well result in a termination of all contributions. Since the Board relies so heavily on public support, it would be unreasonable to follow the government's suggestion on this point. Also, although money is a great denominator, there is no evidence in the record supporting the contention that the less affluent areas are otherwise unable to participate in aiding the local schools. On this state of the facts and the law, the Court is of the opinion that the Board is due to be allowed to continue its practice of permitting local groups to aid local schools.