Henry T. McMILLAN, et al.,
Plaintiffs-Appellees,

v.

ESCAMBIA COUNTY, FLORIDA, et al.,
Defendants-Appellants.

Elmer JENKINS, et al., Plaintiffs,

v.

CITY OF PENSACOLA, et al., Defendants.

Henry T. McMILLAN, et al.,
Plaintiffs-Appellees,

v.

ESCAMBIA COUNTY, FLORIDA, et al.,
Defendants-Appellants.

Nos. 78–3507, 80–5011.

United States Court of Appeals,
Fifth Circuit.*

Dec. 19, 1984.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Richard I. Lott, County Atty., Patricia D. Wheeler, Paula G. Drummond, Richard P. Warfield, D.L. Middlebrooks, B. Dawn Wiggins, Thomas R. Santurri, Pensacola, Fla., for Escambia County.

Ray, Patterson & Kievit, P.A., Pensacola, Fla., Rhyne & Rhyne, William S. Rhyne, Charles S. Rhyne, Donald A. Carr, Washington, D.C., for School Bd.

James U. Blacksher, Larry T. Menefee, Blacksher, Menefee & Stein, Mobile, Ala., Edward Still, Reeves & Still, Birmingham, Ala., Kent Spriggs, Spriggs & Henderson, Tallahassee, Fla., Julius C. Chambers, Napoleon B. Williams, Legal Defense Fund, New York City, for plaintiffs-appellees.

Don J. Caton, City Atty., Pensacola, Fla., for City of Pensacola.

ON REMAND FROM THE UNITED
STATES SUPREME COURT

Before RUBIN and KRAVITCH, Circuit
Judges, and PECK **, Senior Circuit
Judge.

KRAVITCH, Circuit Judge:

Plaintiffs, black voters of Escambia County, Florida, filed this class action in March 1977, challenging the at-large system for electing Escambia County commissioners.[1] The district court held the system was unconstitutional pursuant to the fourteenth and fifteenth amendments and that it violated section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, as amended in 1975. Defendants appealed and this court reversed. *McMillan v. Escambia County, Fla.*, 638 F.2d 1239 (5th Cir.1981) (hereinafter *"Escambia I"*).[2] Plaintiffs sought rehearing and this court reserved ruling on the petition pending the Supreme Court's decision in *Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). Based on the Supreme Court's opinion in *Lodge*, we vacated our prior decision and held that the at-large system for electing Escambia County commissioners violated the fourteenth amend-

ment. *McMillan v. Escambia County, Fla.*, 688 F.2d 960 (5th Cir.1982) (hereinafter *"Escambia II"*).[3] Because of our desire not to further delay elections in Escambia County, we did not reach plaintiffs' assertions that the at-large system also violated the fifteenth amendment and the recently amended section 2 of the Voting Rights Act, 42 U.S.C. § 1973, as amended in 1982. *Id.* at 961–62 & n. 2. On appeal, the Supreme Court declined to review our fourteenth amendment holding because "[a]ffirmance of the statutory ground would moot the constitutional issue presented by the case." *Escambia County, Fla. v. McMillan,* —— U.S. ——, 104 S.Ct. 1577, 1578–79, 80 L.Ed.2d 36 (1984). The Court vacated the judgment of this court and "remand[ed] the case to [the Court of Appeals] for consideration of the question whether the Voting Rights Act provides grounds for affirmance of the District Court's judgment." *Id.* 104 S.Ct. at 1579 (footnote omitted).

■ We now hold that section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, as amended in 1982, does provide grounds for affirmance of the district court's opinion.[4]

** Honorable John W. Peck, U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

1. Originally the suit challenged the at-large election procedures of both the Escambia County Commission and the Escambia County School Board. This suit was consolidated with another class action that challenged the at-large election procedures of the Pensacola City Council. The district court held the Escambia School Board and the Pensacola City Council and this court affirmed as to those two systems. *McMillan v. Escambia County, Fla.*, 638 F.2d 1239 (5th Cir.1981), (appeal on merits); *McMillan v. Escambia County, Fla.*, 638 F.2d 1249 (5th Cir. 1981) (appeal on remedy); *Jenkins v. Pensacola*, 638 F.2d 1249 (5th Cir.1981) (appeal on remedy). Neither the school board nor the city council sought rehearing. Instead, pursuant to the request of those parties, mandates were issued.

2. This court's original opinion was based on the standard for proving discriminatory purpose announced by the Supreme Court in *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). We interpreted *Bolden* as holding that the criteria announced in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973) *(en*

*banc)*, *aff'd on other grounds, sub nom. East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1975), are insufficient, standing alone, to support a finding of discriminatory purpose. *See McMillan v. Escambia County, Fla.*, 688 F.2d 960, 963–64 (5th Cir.1982).

3. In *Lodge*, the Supreme Court substantially clarified the constitutional standard governing vote-dilution claims. Although *Lodge* reaffirmed the holding of *Bolden* that evidence of purposeful discrimination is required to sustain an equal protection challenge to an election system, it reflected a more favorable view of the *Zimmer* factors and a greater deference to the findings of the district court than did the analysis of the *Bolden* plurality. *Escambia II*, 688 F.2d at 964–65.

4. The original complaint in this case listed as defendants Escambia County and the members of the Board of County Commissioners, individually and in their official capacities. During the course of the litigation three of the commissioners were replaced by gubernatorial appointments. In 1983, all five incumbent commissioners ran for election or reelection pursuant to the single-member district plan ordered by the dis-

## I. BACKGROUND [5]

The five members of the Escambia County governing body, the Board of County Commissioners, are elected for staggered four-year terms in accordance with an at-large voting system. Under this system candidates run for numbered places corresponding to the districts in which they live, but each must be elected by the voters of the entire county. There is no majority-vote requirement for the general election, although candidates must obtain a majority of the votes cast in the party primaries to win party nomination.

As of the date of trial, four blacks had run for the county commission, none of whom had been elected. Plaintiffs brought this action claiming that the county's at-large election system unconstitutionally dilutes their votes.

The district court found that blacks comprise seventeen percent of the registered voters of Escambia County and that in elections in which black candidates had run for the County Commission there had been a consistent pattern of racially polarized voting. The court found that the at-large system, coupled with the above factors, prevented black candidates from obtaining a majority of the votes in the County Commission elections. Having concluded that the at-large system had such discriminatory effect, the district court considered whether its purpose was discriminatory. Although the court found that the at-large system had not been enacted for a discriminatory purpose, it concluded that the scheme had been maintained for such a purpose. In finding intentional discrimination, the court relied on a variety of factors, including the adverse effects of past discrimination by the state and county governments on blacks' exercise of their suffrage rights and participation in the political system, the depressed socioeconomic status of blacks in the county, the tenuous-

---

trict court. Four of the incumbents were defeated. The new commissioners took office on November 15, 1983. On December 1, 1983 the Commission voted 3–2 to direct the Commission's attorneys to substitute the new commissioners into the litigation and to file motions to withdraw from the case. On January 5, 1984, the Commission voted 3–2 to adopt an election plan which, in relevant aspects, is identical to the court-ordered plan.

This course of events raised numerous questions as to who had standing to pursue this appeal and whether the appeal is now moot. We find, however, that the plain words of the Supreme Court's opinion, *Escambia County, Fla. v. McMillan,* —— U.S. ——, 104 S.Ct. 1577, 80 L.Ed.2d 36 (1984), are controlling.

In note 1 the Court stated that "[o]nly former and present individual members of the Board are now before the Court as appellants." *Id.* The Court elaborated in note 4:

Aside from the two present commissioners who dissented from [the Board's vote to dismiss the appeal] ... several former commissioners, who lost their seats in the subsequent court-ordered election, remain before the Court. Contrary to appellees' contention, the former commissioners were not automatically dismissed as appellants when they left office, and the Jurisdictional Statement did not limit them to participation in the appeal in their "official capacity." Juris. Statement 1.

*Id.* 104 S.Ct. at 1578. Thus, the county *qua* county is no longer a party to this litigation, notwithstanding the fact that the county was awarded costs in the Supreme Court for its prior involvement in this litigation.

The Supreme Court also determined that this case was not moot, stating:

Appellees have not suggested that the appeal is moot as to the issues of liability or that appellants have no live interest in the controversy.

Appellees do contend that the issue of appropriate remedy is moot, a contention that we need not reach in light of our disposition of the case.

*Id.* Likewise, this court is only concerned with liability and does not reach the question of remedy which is being appealed separately and is still pending in this court, No. 83–3275.

Appellants also claim that appellees should be "stayed from litigating this case" until they pay the judgment for costs awarded against them by the Supreme Court. This argument is not supported by the precedent put forth in appellants' brief. Moreover, appellants are the moving party; appellees cannot be barred from submitting responsive briefs. In addition, staying the litigation would only preserve the status quo, a situation favored by the appellees not the appellants.

For these reasons, we reach the merits of this case.

5. The full background of this case is set out in this court's two vacated opinions, *Escambia I,* 638 F.2d 1239, and *Escambia II,* 688 F.2d 960. Here, we merely repeat an abbreviated version of that background. We do, however, reaffirm all of the factual findings in *Escambia II.*

ness of the state policy behind the at-large system, and other features of the election system that enhanced its discriminatory effect.[6]

█ In our prior decision, we determined that the evidence in the record fully supported the district court's factual findings. *Escambia II*, 688 F.2d at 969. We again make this finding. Our task, then, is to apply the factual findings of the district court to the recently amended Voting Rights Act.

## II. APPLICATION OF SECTION 2

In 1982, Congress amended section 2 of the Voting Rights Act, 42 U.S.C. § 1973, to read as follows:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

> (b) A violation of (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to par-

ticipate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.[7]

This is not a case of first impression. In both *United States v. Dallas County Commission*, 739 F.2d 1529 (11th Cir.1984), and *United States v. Marengo County Commission*, 731 F.2d 1546 (11th Cir.1984), *appeal dismissed, cert. denied,* —— U.S. ——, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984), the Eleventh Circuit has applied the amended section 2 to claims of voter dilution as a result of at-large election systems. Thus, many of the preliminary issues in this case have already been resolved. We have held that section 2 is constitutional under Congress' enforcement power under the fourteenth and fifteenth amendments, *Marengo* 731 F.2d at 1556–63;[8] that section 2 applies to voter dilution cases, *id.* at 1555–56; and that the amended version of section 2 applies to cases, such as this, commenced prior to passage of the amendment. *Id.* at 1553–55; *see also Dallas*, 739 F.2d at 1534.

The *Marengo* court fully delineated the standard for assessing alleged violations under the amended section 2. The court stated: "Congress wished to eliminate any intent requirement from section 2, and therefore changed the terms of § 2(a), 42 U.S.C.A. § 1973(a) (West Supp.) (1983), to

---

**6.** In addition to the above circumstantial or *Zimmer* evidence, the district court found that the County Commissioners' refusal to submit to voters a proposed referendum that would change the election system from at-large to single-member districts further supported a finding that the at-large system was being maintained for a discriminatory purpose.

**7.** Prior to the 1982 amendment, 42 U.S.C. § 1973 stated:

> No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to

vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title.

**8.** Although defendants allege that the present case is distinguishable on its facts from *Marengo* in regard to the constitutionality of section 2, defendants' discussion of this issue is not based on factual distinctions between the two cases. Rather, defendants claim that section 2 is unconstitutional because it amends the Constitution by eliminating the requirement of showing a discriminatory purpose, the same issue that was decided adversely to defendants in *Marengo*.

forbid any practice that 'results in' discrimination." *Id.* at 1563. The amendment intended "to restore the legal standard that governed voter discrimination decisions before the Supreme Court decided *Mobile v. Bolden." Id.* at 1550 (footnote omitted).[9] The *Marengo* court summarized the new test:

> The language and history of the statute make clear several points. First, discriminatory intent need not be shown to establish a violation. Second, at-large elections are not prohibited per se, nor does a lack of proportional representation automatically require a finding of a violation. At the same time, however, the absence of minority elected officials may be considered as an indicium of violation, and an at-large system will violate the statute *if* it results in a denial of equal participation. Congress noted that some at-large systems diluted black votes, and would be vulnerable under the amended statute. 1982 Senate Report at 6. Third, section 2 focuses not on whether minority groups receive adequate public services but on whether minorities have an equal right to *participate* in the political process. *See id.* at 36.

The Senate Report gives particular approval to the jurisprudence developed by the former Fifth Circuit in cases immediately following *White v. Regester* [412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973)] most notably *Zimmer v. McKeithen,* 5 Cir.1973, 485 F.2d 1297 (*en banc*), aff'd *per curiam sub nom. East Carroll Parish School Board v. Marshall,* 1976, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296. *Zimmer* listed a number of factors to be considered in dilution cases. The Senate Report repeats and

elaborates on this list, characterizing them as "typical factors." These factors are to be weighed under a "totality of the circumstances approach."

*Id.* at 1564–66 (footnotes omitted).

The typical factors listed in the Senate Report are:

1.  the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2.  the extent to which voting in the elections of the state or political subdivision is racially polarized;

3.  the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4.  if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5.  the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6.  whether political campaigns have been characterized by overt or subtle racial appeals;

7.  the extent to which members of the minority group have been elected to public office in the jurisdiction.

> Even a cursory examination of that [the section 2] claim, however, clearly discloses that it adds nothing to the appellees' complaint.... [I]t is apparent that the language of § 2 no more than elaborates upon that of the Fifteenth Amendment and the sparse legislative history of § 2 makes it clear that it was intended to have an effect no different from that of the Fifteenth Amendment itself. 446 U.S. at 60–61, 100 S.Ct. at 1496 (footnotes omitted).

---

**9.** Prior to *Bolden,* there was relatively little judicial interpretation of section 2. Rather, most courts chose to deal exclusively with the constitutional standards, probably under the assumption that the standard under section 2 was equivalent. *See* Parker, *The "Results" Test of Section 2 of the Voting Rights Act: Abandoning the Intent Standard,* 69 Va.L.Rev. 715, 729–30 (1983). In *Bolden,* the plurality opinion explicitly tied the two standards together:

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

■ whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

■ whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

While these enumerated factors will often be the most relevant ones in some cases other factors will be indicative of the alleged dilution.

S.Rep. No. 417, 97th Cong., 2d Sess. 28–29 *reprinted in* 1982 U.S.Code Cong. & Ad. News 177, 206–07 (footnotes omitted).[10] The *Marengo* court then applied these typical factors to the situation in Marengo County.[11] We follow this approach today. *See also Dallas,* 739 F.2d at 1534–1540.

**A.** *Racially Polarized Voting*

■ Although no factor is indispensable, the legislative history of the amendment to section 2 indicates that racially polarized voting will ordinarily be the keystone of a dilution case. *Marengo* at 1566. Defendants contend that voting in Escambia County is not polarized. This contention is not supported by the evidence. As we stated in *Escambia II:*

> The district court found that blacks constitute twenty percent of the population and seventeen percent of the registered voters of Escambia County. Al-

though black citizens had run for County Commission on four occasions, no black candidate had ever won an election. None of the blacks who ran was able to obtain the majority votes necessary to win the Democratic primary. The court found that in each of the cases in which a black candidate ran for County Commission the voting had been severely polarized along racial lines. In other words, "whenever a black challenges a white for countywide office, a consistent majority of the whites who vote will consistently vote for the black's opponent.[" *McMillan v. Escambia County, Fla.,* PCA No. 77–0432, slip op. at 12.] The court found that the numerical minority of blacks coupled with the white block vote prevented blacks from obtaining a majority of votes in the county.

*Id.* at 965–66.[12]

Defendants also assert that prior voting statistics are the result of the failure of blacks to nominate outstanding black candidates or any black person since 1970. As noted in both *Marengo* and *Dallas,* "the failure of the blacks to solicit white votes may be caused by the effects of past discrimination ...." *Dallas County,* 739 F.2d at 1536; *accord Marengo,* 731 F.2d at 1567.

**B.** *Past Discrimination and Its Lingering Effects* [13]

■ Defendants are incorrect when they assert that prior discrimination is irrelevant under section 2. As stated by the *Marengo* court:

> which black candidates ran, ranged from .85 to .98. *McMillan v. Escambia County,* PCA No. 77–0432, Appendix A. The district court's findings concerning racially polarized voting in Escambia County elections are set forth more fully in our original opinion. 638 F.2d at 1241–42 n. 6. *See also Escambia II,* 688 F.2d at 966 n. 14.

---

**10.** Like the Senate Report and the *Marengo* court, "we do not preclude the possibility that factors other than those enumerated in *Zimmer* may be relevant in an appropriate case." 731 F.2d at 1566 n. 32.

**11.** The *Marengo* court emphasized that "the *Zimmer* factors serve a different purpose in litigation under section 2 from their purpose in constitutional litigation." 731 F.2d at 1566.

**12.** The $R^2$ coefficient, which reflects the percentage of variation in the vote attributable to the race of the registered voters in the races in

**13.** This factor is a combination of two of those outlined in the Senate Report: past discrimination in voting practices and lingering effects from discrimination in health, education, and employment. *See Dallas,* 739 F.2d at 1535 n. 3.

A history of discrimination is important evidence of both discriminatory intent and discriminatory results. A history of pervasive purposeful discrimination may provide strong circumstantial evidence that the present-day acts of elected officials are motivated by the same purpose, or by a desire to perpetuate the effects of that discrimination. *Rogers v. Lodge*, 458 U.S. at 624, 102 S.Ct. at 3279. Under the results test, the inquiry is more direct: past discrimination can severely impair the present-day ability of minorities to participate on an equal footing in the political process. Past discrimination may cause blacks to register or vote in lower numbers than whites. Past discrimination may also lead to present socioeconomic disadvantages, which in turn can reduce participation and influence in political affairs. *See Zimmer*, 485 F.2d at 1306.

731 F.2d at 1567 (footnote omitted).

In the present case, the district court found that the County Commission and School Board election systems "had their genesis in the midst of a concerted state effort to institutionalize white supremacy." *McMillan v. Escambia County, Fla.*, PCA No. 77–0432, slip op. at 4 (N.D.Fla., July 10, 1978).[14]

■ In addition, discrimination against minorities outside of the electoral system cannot be ignored in assessing that system. When there is clear evidence of present socioeconomic or political disadvantage resulting from past discrimination, the burden is on defendants to show that reduced political participation is the result of something besides this discrimination. *Dallas*,

739 F.2d at 1537, *Marengo*, 731 F.2d at 1568–69. *See also* S.Rep. No. 417, 97th Cong., 2d Sess. 29, n. 114, *reprinted in* 1982 U.S.Code Cong. & Ad.News 207, n. 114. The court below found plentiful evidence of such discrimination. State-enforced segregation has created two separate societies in Escambia County in which churches, clubs, neighborhoods and, until recently, schools in the county have remained segregated by race. The lower court found that this "continued separation [of blacks] from the dominant white society" not only has "left blacks in an inferior social and economic position, with generally inferior education," but has "helped reduce black voting strength and participation in government." *McMillan v. Escambia County, Fla.*, PCA No. 77–0432, slip op. at 17.

## C. Election Practices

■ The present case concerns a process whereby a majority vote is required during the primary in an area where the Democratic Party is dominant. This factor weighs in favor of a finding of dilution. *Dallas County*, 739 F.2d at 1536.[15] In addition, although there is no anti-single shot provision, the requirement that candidates run for numbered posts may have an equally adverse effect on plaintiffs. *Dallas County*, 739 F.2d at 1536.[16] These factors, in addition to the large population and geographical size of the county,[17] enhance the problems faced by blacks seeking access to the political process. *McMillan v. Escambia County, Fla.*, PCA No. 77–0432, slip op. at 18–19.[18]

**14.** The history of the electoral system is outlined in *Escambia II,* 688 F.2d at 967.

**15.** The district court observed that although there is no majority requirement for the general election, "as a practical matter, no one has in recent history won a general election without a majority." *McMillan v. Escambia County, Fla.,* PCA No. 77–0432, slip op. at 18.

**16.** The district court found that this requirement had the effect "that blacks are always pitted in head-on-head races with white candidates, and that the black community cannot

concentrate its votes in a large field of candidates." *McMillan v. Escambia County, Fla.,* PCA No. 77–0432, slip op. at 18.

**17.** The county is "approximately 657 square miles (fifty-one miles in length) with a population of 205,334 in 1970 and a projected population of 269,508 in 1980." *McMillan v. Escambia County, Fla.,* PCA No. 77–0432, slip op. at 3.

**18.** Another election practice is a $1,000 registration fee for candidates. Although defendants claim this fee is waivable if a candidate receives a certain number of signatures, it is still an

## D. *Tenuous State Policy*

■ Although a strong state policy in favor of at-large elections is less important under the results test, a tenuous explanation for at-large elections is circumstantial evidence that the system is motivated by discriminatory purposes and has a discriminatory result. *Marengo,* 731 F.2d at 1571. Defendants claim that the at-large system is preferable because it makes the commission responsive to the needs of the whole county. The district court found, however, that "the residence district of each commissioner is more or less regarded as the district of that commissioner for which he has responsibility and for whose needs he is the particular advocate on the commission." *McMillan v. Escambia County, Fla.,* PCA No. 77–0432, slip op. at 30.[19] Thus, the district court concluded that the policy behind the at-large system for electing county commissioners is tenuous.

## E. *Extent to Which Blacks Have Been Elected to Public Office in Escambia County*

Under the at-large system no black was ever elected to the County Commission. In addition, prior to this litigation, no black had been elected to the Escambia County School Board[20] and only two blacks had been elected to the Pensacola City Council.[21]

Defendants argue that black access to the political process is evidenced by the fact that twenty percent of the Escambia County Democratic Executive Committee is black. This committee, however, is elected from districts (precincts) rather than at-

large. Thus, we agree with plaintiffs that the racial composition of the Democratic committee shows that the election structure does make a difference. Nor does the fact that no black ran for the Commission between 1970 and the time this litigation commenced, help defendants. Rather, the lack of black candidates is a likely result of a racially discriminatory system. *See McMillan v. Escambia County, Fla.,* PCA No. 77–0432, slip op. at 10. *See also Marengo,* 731 F.2d at 1568–69; S.Rep. No. 417, 97th Cong., 2d Sess. 29, n. 114, *reprinted in* 1982 U.S.Code Cong. & Ad.News 207, n. 114.

## F. *Other Factors*

■ The district court did not find three of the "typical factors" listed in the Senate Report: denial of access to a slating process; overt or subtle racial appeals in political campaigns; a significant lack of responsiveness on the part of elected officials to the particular needs of the members of the minority group.[22] The district court also found no significant difference currently existing between black and white voter registration. The lower court, however, found that "other barriers ... effectively operate to preclude access for blacks." *McMillan v. Escambia County, Fla.,* PCA No. 77–0432, slip op. at 10.

The lack of these factors, however, does not lead this court to hold for the defendants. In *Marengo,* the court found no slating process working against plaintiffs. The *Marengo* court also found no evidence of racial appeals, but noted that "[i]n the seventies overt political racism was less

---

additional barrier to blacks who suffer from economic discrimination.

**19.** A single district system for primaries was in effect until 1954. At the same time there was an at-large general election. The effect of this dual system was "to insure that commissioners were elected from single-member districts." *McMillan v. Escambia County, Fla.,* PCA No. 77–0432, slip op. at 24.

**20.** After the trial in this case, Mr. Vernon McDaniel, a black educator, was elected to the School Board.

**21.** The two blacks elected to the City Council had been initially appointed to the council to fill vacant seats. Blacks comprise one-third of the City of Pensacola population and twenty-three percent of the registered voters. *McMillan v. Escambia County, Fla.,* PCA No. 77–0432, slip op. at 13.

**22.** Although the court found that the commissioners had generally been responsive to the interests of black citizens, it noted two areas in which they had not: appointments of blacks to committees or boards and housing policy. *See Escambia II,* 688 F.2d at 968 n. 16.

prevalent than in the sixties" yet, "the continuing effects of past discrimination are still with us." 731 F.2d at 1571. Thus, absence of such evidence of discrimination "should not weigh heavily against a plaintiff proceeding under the results test of section 2." *Id.* Similarly, while responsiveness is an important factor under the intent test it "is considerably less important under the results test." *Id.* at 1572. *See N.A.A.C.P. v. Gadsden County*, 691 F.2d 978, 983 (11th Cir.1982). There are two reasons for this: "First, § 2 protects the access of minorities not simply to the fruits of government but to participation in the process itself.... Second, responsiveness is a highly subjective matter, and the subjectivity is at odds with the emphasis of section 2 on objective factors." *Marengo*, 731 F.2d at 1572. *See also* S.Rep. No. 417, 97th Cong., 2d Sess. 29, n. 116, *reprinted in* 1982 U.S.Code Cong. & Ad.News 207 n. 116.

The absence of these, or any other, factors is not conclusive under the section 2 "totality of the circumstances" test. As the *Marengo* court concluded:

> No formula for aggregating the factors applies in every case. Some authorities suggest that a finding of discriminatory result is compelled when the plaintiffs show racially polarized voting combined with an absence of minority elected officials. *See NAACP v. Gadsden County*, 691 F.2d at 982–83; Note, *The Constitutional Significance of the Discriminatory Effects of At-Large Elections*, 91 Yale L.J. 974, 998 (1982). Others have argued that discriminatory effect is irrebuttably established when these factors are combined with a history of discrimination and present socioeconomic disparities between races. *See Blacks United For Lasting Leadership, Inc. v. City of Shreveport*, 5th Cir.1978, 571 F.2d 248, 257, (Wisdom, J., dissenting); Hartman, [*Racial Vote Dilution and Separation of Powers: An Explanation of the Conflict Between the Judicial "Intent" and the Legislative "Results" Standards* ] 50 Geo.Wash.L.Rev. [689,] 729–32 [ (1982) ]. Certainly, when the plaintiffs established

these factors and no others weigh strongly against the plaintiffs' case, dilution must be found.

731 F.2d at 1574.

■ Plaintiffs in the present case have, indeed, shown that these factors are present, as well as the other indications of discriminatory result discussed in this opinion. We agree with the district court that "[i]n sum, a preponderance of the evidence shows that the election system of the board of county commissioners effectively dilutes the votes of black citizens." *McMillan v. Escambia County, Fla.*, PCA No. 77–0432, slip op. at 32. Thus, we find that the record shows a clear violation of the results test adopted by Congress in section 2 of the Voting Rights Act.

■ In addition, this court already has determined that the at-large election system was maintained for a discriminatory purpose and thus violated the fourteenth amendment. *Escambia II*, 688 F.2d at 969. This showing of intent is sufficient to constitute a violation of section 2 just as we found that it was sufficient to constitute a violation of the fourteenth amendment. The results test of section 2 was intended to be a less stringent standard that substantially lessened the burdens on plaintiffs. Moreover, Congress intended that fulfilling *either* the more restrictive intent test or the results test would be sufficient to show a violation of section 2. The Senate Report states:

> The amendment to the language of Section 2 is designed to make clear that plaintiffs need not prove discriminatory purpose in the adoption or maintenance of the challenged system or practice in order to establish a violation. *Plaintiffs must either prove such intent, or alternatively*, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process.

S.Rep. No. 417, 97th Cong., 2d Sess. 27, *reprinted in* 1982 U.S.Code Cong. & Ad. News 205 (footnote omitted). The Senate

Report further states that if a section 2 plaintiff chooses to prove discriminatory intent, "direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions" would be relevant evidence of intent. *Id.* at 27 n. 108, U.S.Code Cong. & Admin.News 1982, p. 205 n. 108. *See also Marengo*, 731 F.2d at 1553.

For the foregoing reasons, we hold that the at-large system for electing the Escambia County Commission violates section 2 of the Voting Rights Act, 42 U.S.C. 1973, as amended in 1982, and thus we AFFIRM.[23]

---

23. Given the complete factual findings of the court below, we see no need to remand this case for further evidentiary hearings. While "the ultimate legal theory of the plaintiffs' case has changed, from 'intent' to 'results' ... the same evidence is relevant to both theories." *Marengo County*, 731 F.2d at 1574.