United States Court of Appeals,

Eleventh Circuit.

No. 94-3453.

Mary GEORGE; Charles L. Stovall; Martha Ray Bethel; W.O. Wells, Reverend; Joann Stovall; Barbara Jenkins; Sylvester Weaver, Plaintiffs-Appellants,

v.

CITY OF COCOA, FLORIDA: Cocoa City Council; Lester Campbell, Mayor-Councilmember of the City of Cocoa; Ray Debord, John Lee Blubach, Dave Salisbury, members of the Cocoa City Council, et al., Defendants-Appellees,

Ray Griffin, Member of the Cocoa City Council; Fred Galey, Brevard County Supervisor of Elections, Defendants.

Feb. 29, 1996.

Appeal from the United States District Court for the Middle District of Florida. (No. 93-257-CIV-ORL-18), G. Kendall Sharp, Judge.

Before ANDERSON and BLACK, Circuit Judges, and HENDERSON, Senior Circuit Judge.

PER CURIAM:

This case comes to us on appeal from the district court's order denying the parties' joint motion to approve a consent decree and enter judgment. We have jurisdiction and for the reasons set forth in this opinion, we reverse and remand for further proceedings not inconsistent with this opinion.

*Factual and Procedural Background*

On April 12, 1993, appellants filed a complaint in the United States District Court for the Middle District of Florida; they alleged that the at-large method of electing city council members in Cocoa dilutes minority voting strength in violation of section

2 of the Voting Rights Act of 1965.[1]  In July 1993, the Cocoa City Council appointed Rudolph Stone, one of the African-American plaintiffs in the voting rights litigation, to fill a vacant council seat.  Immediately upon his appointment, Stone withdrew as a plaintiff and was named a defendant.  In November 1993, Stone was elected under the at-large system to keep his council seat for another three-year term.

Settlement negotiations in the voting rights litigation ultimately led to an agreement.  The Cocoa City Council voted to replace the system of at-large elections for all five of its members with a system under which four members would be elected from single member districts and the fifth council member, who also serves as the mayor, would continue to be elected at-large. African-American voters would constitute a majority of the voters in one of the proposed single member districts.  Three members of the city council, including Stone, voted in favor of the proposed consent decree;  the remaining two members voted against it.

On July 28, 1994, the parties to the voting rights litigation filed a joint motion in the district court to enter the consent decree.  Four Cocoa voters, appearing as *amici curiae* in opposition to the proposed consent decree, suggested to the district court that Stone should have abstained from the city council's decision whether to adopt the redistricting plan.  The district court ordered a hearing on the consent decree, and instructed the parties and *amici* to limit their arguments to the issue of Stone's

---

[1]Pub.L. No. 89-110, § 2(b), 79 Stat. 437, *codified at* 42 U.S.C. § 1973(b) (1988).

participation in the city council's consideration of the redistricting plan. Following this hearing, the district court concluded that Stone's participation in the vote constituted a conflict of interest under Florida's ethics statutes, and that Stone's vote could not be counted. In its October 25, 1994, order, the court explained:

> In this case, Mr. Stone was in a unique position to gain from the redistricting decision made by the Cocoa City Council. Mr. Stone had originally filed this suit as a plaintiff seeking to increase the voting power of Cocoa's black community. Though Mr. Stone had been dropped as a plaintiff and had been elected along with the other council members through the at-large process, as an African-American candidate he stood to gain inordinately from the vote. The consent decree's solution to the problem of increasing black voting power would create a district where the black majority was expected to elect a black representative, and Mr. Stone would be a resident of that district. In short, by voting on this decree, Mr. Stone facilitated his own chances for reelection and involved himself in a situation fraught with the potential for conflicting interests.

R2-40-6-7. With the disqualification of Stone's tie-breaking vote, the remaining city council members were deadlocked (two-two) on the redistricting plan. The district court thus held that the consent decree was void and refused to enter judgment.

*Discussion*

The issue is whether the district court misapplied Florida law in disqualifying Stone's vote on the redistricting plan.[2] Neither party argues in support of the district court's decision; both parties agree that Stone's vote should not have been disqualified. We also conclude that the district court erred.

Florida law imposes on elected officials an affirmative duty

---

[2]We do not address the merits of the proposed consent decree.

to vote on all matters before them; abstaining from a vote is prohibited unless "there is, or appears to be, a possible conflict of interest under § 112.311, § 112.313, or § 112.3143." Fla.Stat.Ann. § 286.012 (West 1995). Section 286.012 speaks only of when a public official *may* abstain from voting; it does not describe the circumstances under which a public official *must* abstain from voting. The statutory provision dealing with mandatory abstention from city council voting is Fla.Stat.Ann. § 112.3143(3)(a) (West 1995); it provides that "[n]o county, municipal, or other local public officer shall vote in his official capacity upon any measure which would inure to his special private gain or loss...." Under § 112.3143(3)(a), the identification of a "special private gain or loss" to the city council member as a result of his or her vote is a necessary condition for disqualification.

A "special private gain" described by the voting conflicts statute almost always (if not always) refers to a financial interest of the public official that is directly enhanced by the vote in question. *See Izaak Walton League of America v. Monroe County,* 448 So.2d 1170, 1173 n. 8 (Fla.App. 3 Dist.1984) (explaining that § 112.3143 does not apply "to bias or prejudice on the part of a public officer based on other than private economic interests or relationships" (quoting Op.Fla.Comm. Ethics 79-14 (1979))); *see also* Op.Fla.Comm. Ethics 90-20 (1990) (holding that a city council member, whose property would be affected by proposed special assessment, must abstain from voting, "[g]iven the *direct, personal financial effect* striking the assessment would have on

[his] interests) (emphasis added); Op.Fla.Comm. Ethics 79-14 (1979) (holding that a city council member may *not* abstain from voting on matters involving his personal foe and stating that "it is clear that, when adopting the Code of Ethics, the Legislature was concerned primarily with the effect of a public official's economic interests and relationships upon the performance of his public duties, rather than the effect of his personal preferences or animosities.").

Stone's vote on the redistricting plan did not result in any direct financial benefit to him. If a "special private gain" under § 112.3143(3)(a) is limited to a financial gain, then Stone's vote should not have been disqualified. The district court, however, stated that it would be "inappropriate" to limit the application of § 112.3143 to conflicts surrounding finances,[3] and held that Stone's status as a potential African-American candidate in a district in which the majority of voters were also African-American was a "special case" that presented a "heightened potential for conflict." R2-40-8.

Assuming *arguendo* that § 112.3143(3)(a) is not limited to financial matters, we address potential non-economic "interests" of

---

[3]The only authority cited by the district court for this proposition is *Garner v. State Com'n on Ethics,* 439 So.2d 894 (Fla.App. 2 Dist.1983)—a case that has nothing to do with voting. In *Garner,* the ethics commission considered a complaint alleging that a college president abused his official position by seeking sexual favors from female subordinate personnel. The ethics commission found that this behavior violated Fla.Stat.Ann. § 112.313(6) (West 1994), which provides that "No public officer or employee of an agency ... shall corruptly use or attempt to use his official position ... to secure a special privilege, benefit, or exemption for himself or others." The Florida appeals court held that sexual favors constitute a "special benefit" within the meaning of the statute. *Garner,* 439 So.2d at 895.

Stone. We can imagine only two such putative "interests" that may have been affected by his vote: his ideological interests as an African-American voter and former plaintiff in the voting rights litigation; and his political interests as an incumbent city council member planning to run for reelection. Neither of these interests would have required Stone to abstain from voting.

Because Stone is a former plaintiff in the voting rights litigation, it may be reasonable to infer that Stone has an ideological interest in changing the way that city council members in Cocoa are elected. The plaintiffs in the voting rights litigation contended that the at-large electoral system unlawfully diluted minority voting strength, and sought to have it replaced with a system of single-member districts. Because the city's redistricting plan adopts some of the relief requested in the voting rights litigation, Stone's putative ideological interest was no doubt furthered by his vote as a city council member. Nevertheless, an ideological victory is *not* the kind of "special private gain" that disqualifies an elected official's vote. The *Izaak Walton* case clearly establishes that a person who holds a preconceived and publicly expressed opinion on a particular matter is not barred from voting on that matter as a public official. *See id.,* 448 So.2d at 1171 (holding that "political officeholders may not be prevented from performing the duties they have been elected to discharge [i.e., voting] merely because ... they have previously expressed, publicly or otherwise, an opinion on the subject of their vote"); *see also* Op.Fla.Comm. Ethics 88-18 (1988) (same). If ideology presented a conflict of interest situation, no public

official could vote on any of his or her campaign promises. More specifically relevant to this case, there is precisely the same inference of an ideological interest on the part of the other council members arising from their status as defendants in the litigation and the positions they apparently took in the case.

The district court recognized that Stone's ideological interests as a former plaintiff in the voting rights litigation could not serve as a valid basis for disqualification,[4] and focused instead upon Stone's political interests as an incumbent city council member planning to run for reelection in one of the new single member districts. The district court reasoned that Stone's vote on the redistricting plan inured to his "special private gain" because it "facilitated his chances for reelection." R2-40-7. To constitute a prohibited voting conflict, however, the possibility of gain must be direct and immediate, not remote and speculative. In Op.Comm. Ethics 93-4 (1993), for example, a city council member asked the ethics commission whether he could vote on rent increases at the city's mobile home park, where he proposed to build a similar park across the street. The ethics commission found that the assumption that the city commissioner could charge higher rents at his "still to be built" park was too remote and speculative to create a voting conflict. *See also* Op.Fla.Comm. Ethics 94-018 (1994) ("[W]here the official's ... gain (or loss) would require many steps and be subject to many contingencies, with the outcome

---

[4]*See* R2-40-5 ("Respect for a citizen's right to express opinions on matters of public importance requires courts to permit officials to vote on issues even when they have previously filed suits to protest the burdening of their rights.").

by no means certain, any gain or loss would be remote and speculative."). In this case, the district court speculated that Stone planned to run for reelection in 1996 [5] and that Stone's chances for reelection were improved by the redistricting plan. As an incumbent who won an election under the at-large system, however, the transformation to single-member districts actually may have impaired Stone's interests as a candidate by increasing the competitiveness of elections. *See, e.g., McMillan v. Escambia County,* 748 F.2d 1037, 1045 (5th Cir.1984) (noting that at-large electoral systems may deter candidacies, particularly by African-American candidates, for elected office). In short, Stone's interests as a potential candidate were too "speculative and remote" to warrant disqualification of his vote.

Furthermore, every one of the incumbent city council members, not just Stone, had an interest in shaping districts favorable to his or her reelection. For example, district boundaries may have been drawn to avoid future contests between incumbent city council members. *Cf. Karcher v. Daggett,* 462 U.S. 725, 740, 103 S.Ct. 2653, 2663, 77 L.Ed.2d 133 (1983) (describing the avoidance of contests between incumbents as a "legitimate objective" in legislative redistricting); *Gaffney v. Cummings,* 412 U.S. 735, 752-54, 93 S.Ct. 2321, 2331-32, 37 L.Ed.2d 298 (1973) (recognizing that legislators involved in redistricting decisions inevitably take into account various "political considerations" in drawing

---

[5]The record indicates that Stone was elected under the at-large system in November 1993, and that city council members in Cocoa serve three-year terms. Stone would therefore be up for reelection in November 1996—more than two years after the district court entered its order in this case.

district lines).  In this regard, there is no difference in principle between Stone and the other city council members:  each member's chances for reelection was directly affected by the drawing of district lines.  It would be absurd to interpret Florida's voting conflicts statute in such a way that would disqualify all members of legislative bodies from participating in legislative redistricting decisions.  *Cf. United States v. Will,* 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980) (construing the judicial disqualification statute as implicitly incorporating a common-law "rule of necessity" exception, which applies when all federal judges have an interest in the outcome of a case); Op.Fla.Comm. Ethics 86-57 (1986) (advising that the threat of a lawsuit arising from a vote does not require disqualification; "otherwise, any person might be able to disqualify an entire board").

In its order disqualifying Stone's vote, the district court appears to understand that its interpretation of Florida's voting conflicts statute could undermine the ability of all legislators to participate in the redistricting process.[6]  To distinguish Stone from the other city council members, the district court reasoned that Stone was somehow in a "unique position to gain from the redistricting decision."  R2-40-6.  However, the district court was vague in its identification of Stone's supposed unique position. As demonstrated above, there is no legitimate basis to distinguish Stone from the other council members.

---

[6]The court cautioned that "[t]his holding should not be construed to disqualify all legislators from participating in all issues related [to] voting and elections."  R2-40-7.

If the district court relied on Stone's race to distinguish Stone and disqualify his vote,[7] that reliance was inappropriate. Any benefit enjoyed by hundreds of African-American residents of Cocoa is not a "special private gain" within the meaning of Florida's voting conflicts statute, § 112.3143(3)(a). *See* Op.Fla.Comm. Ethics 93-012 (pension board trustee, who is also a participant in a class action against the city regarding the

---

[7]In the hearing on the proposed consent decree, counsel for *amici* (Mr. Meros) repeatedly emphasized Stone's race as a basis for distinguishing him from the other city council members. When asked by the court what "stake" Stone had that would create a "special private gain," Mr. Meros responded as follows:

> His stake was, number one, as a voter of the council, which is more general. Number two, as an African-American. He was asserting that he, that his rights as an African-American were not sufficiently protected and as a result of that he wanted the opportunity to have his vote enhanced by virtue of the creation of single member districts. That is a personal stake by Councilman Stone.
>
> ....
>
> What personal stake did he have in this? His personal stake as an African-American.

R3-6-7.

In closing his argument, Mr. Meros repeated:

> I would suggest that when you talk about a "special private gain," special means as opposed to communal, individual as opposed to group, and Councilman Stone in this litigation asserted that he had a private direct interest in this litigation, clearly special and individual due to his race as an African-American.

R3-13.

Although some of the district court's language could be construed to indicate that the district court accepted the foregoing invitation to consider race, we decline to believe that. Rather, we surmise that the district court simply failed to think the matter through thoroughly.

pension plan, is *not* disqualified from voting on measures concerning the lawsuit, because the number of persons who stand to benefit from such measures (297) is sufficiently large that any gain to the trustee would not be "special"). Moreover, any interpretation of § 112.3143(3)(a) that disqualifies an elected official's vote on a matter of public concern because of race obviously could not withstand scrutiny. *Cf. Brown v. Moore,* 583 F.Supp. 391, 395-96 (M.D.Ala.1984) (African-American school commissioner is not disqualified from voting on a school desegregation consent decree on the basis that the plaintiff class is composed of members of his race). We therefore hold that race could not be a valid basis for disqualifying an elected official's vote under § 112.3143(3)(a).

## Conclusion

For the foregoing reasons, the judgment of the district court is REVERSED and REMANDED for further proceedings not inconsistent with this opinion.